# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| KARA LEE HEWETT,<br>    Plaintiff, | No. 3:13-cv-1382 (SRU) |
| v. | |
| TRIPLE POINT TECHNOLOGY, Inc.,<br>    Defendant. | |

## SECOND CORRECTED ORDER

*Pro se* plaintiff, Kara Hewett, brought this claim alleging that defendant, Triple Point Technology, Inc. ("TPT"), violated the Family and Medical Leave Act ("FMLA"), 29 U.S.C. §§ 2601, *et seq.*, by (1) interfering with her ability to obtain leave under the FMLA and (2) retaliating against her for requesting or appearing to need FMLA leave. (doc. 1) On February 14, 2014, I granted TPT's motion to dismiss Hewett's initial complaint with respect to the interference claim because Hewett had failed to allege that she had given notice to TPT of her need for leave, and I denied TPT's motion to dismiss with respect to the retaliation claim due to the timing of Hewett's termination. (doc. 59)

Hewett filed a second amended complaint on February 17, 2014. (doc. 64). The parties engaged in a contentious discovery process, which concluded on June 15, 2015. (doc. 228) TPT filed the instant motion for summary judgment on July 15, 2015. (doc. 338)

For the following reasons, TPT's motion for summary judgment is **granted**. Hewett has failed to state a cognizable claim for FMLA interference, and she has failed to produce sufficient evidence that TPT's non-discriminatory reason for her termination was a pretext and the real reason was to retaliate against her for requesting FMLA leave.

1

**I. Standard of Review**

A. <u>Motion for Summary Judgment</u>

Summary judgment is appropriate when the record demonstrates that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

When ruling on a motion for summary judgment, the court must construe the facts of the case in the light most favorable to the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970). Further, the court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Aldrich v. Randolph Cent. Sch. Dist.*, 963 F.2d 520, 523 (2d Cir. 1992), *cert. denied* 506 U.S. 965 (1992); *see also Ramseur v. Chase Manhattan Bank*, 865 F.2d 460, 465 (2d Cir. 1989) (quoting *Schwabenbauer v. Board of Ed.*, 667 F.2d 305, 313 (2d Cir. 1981)).

When a motion for summary judgment is properly supported by documentary and testimonial evidence, the nonmoving party may not rest on the allegations or denials of her pleadings alone and must present sufficient probative evidence to establish a genuine issue of material fact. *Anderson*, 477 U.S. at 256l; *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986); *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995); *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir. 1991) ("Only when reasonable minds could not differ as to the import of the evidence is summary judgment proper."); *see also Suburban Propane v. Proctor Gas, Inc.*, 953 F.2d 780, 788 (2d Cir. 1992). If the nonmoving party submits evidence that is "merely colorable," or is not "significantly probative," summary judgment may be granted. *Anderson*, 477 U.S. at 249–50.

> The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for

> summary judgment; the requirement is that there be no genuine issue
> of material fact. As to materiality, the substantive law will identify
> which facts are material. Only disputes over facts that might affect the
> outcome of the suit under the governing law will properly preclude
> the entry of summary judgment. Factual disputes that are irrelevant or
> unnecessary will not be counted.

*Id.* at 247-48. To present a "genuine" issue of material fact, there must be contradictory evidence "such that a reasonable jury could return a verdict for the non-moving party." *Id.* at 248.

If the nonmoving party has failed to make a sufficient showing on an essential element of his case for which he has the burden of proof at trial, then summary judgment is appropriate. *Celotex*, 477 U.S. at 322. In such a situation, "there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 322-23; *accord Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995) (movant's burden satisfied if he can point to an absence of evidence to support an essential element of nonmoving party's claim). In short, if there is no genuine issue of material fact, summary judgment may enter. *Celotex*, 477 U.S. at 323.

## II. Background

Hewett became a full-time at-will employee at TPT on July 11, 2011, and TPT terminated her employment on September 20, 2013.

A. Hewett's Health Concerns

Hewett suffers from ongoing severe asthma, asthmatic bronchitis, and hypogammaglobulinemia, an auto-immune disorder that often leads to "frequent and recurrent sinus and lung infections." Am. Compl. 5 (doc. 64); Mark E. Rose & David M. Lang,

"Evaluating and managing hypogammaglobulinemia," 73 *Cleveland Clinic J. Med.* 133 (2006), *available at* http://ccjm.org/content/73/2/133.full.pdf (last accessed March 21, 2016).

Her asthma also requires use of a nebulizer to administer medication several times a day. Hewett Tr. at 81–88. She often traveled home during the workday to administer that medication. *Id*. at 85–86. Hewett's email correspondence with TPT's human resources department indicates that on August 13, 2013, her supervisor, Carlos Lebrija expressed concern over late arrivals to work and overlong lunch breaks.[1] 2d Am. Compl., Ex. 2 at 31 (also produced as Lehn Aff., Ex. C). Hewett countered that such trips were necessary for her to travel from her office to her home to administer her asthma treatments. *Id*. Hewett accordingly offered to track her time in accordance with the ADA or the FMLA. *Id.* Hewett then met with Lindsey Lehn, Human Resource Manager for TPT, on or around August 16, 2013 to discuss the problem. *Id.* at 32. TPT accommodated Hewett's needs by making space available at her workplace to allow Hewett to administer her asthma medication there. *Id.* TPT further requested that she notify human resources whether the accommodation resolved her concerns. *Id.* Hewett agreed that it did. *Id.*

In addition to her asthma treatments, Hewett states that she experienced recurrent lung infections from June through November 2012. Hewett Tr. at 153–54 (doc. 357-4). She states that she experienced an additional lung infection in August 2013, and she suffered asthma attacks in addition to her lung infection in August 2013. *Id*. Hewett took sick leave for that infection on August 19 and 20. Lehn Aff., Ex. B (time report of Hewett's sick leave). She experienced another lung infection in mid-September, for which she took leave on September 16 and 18, 2013. *Id.*; *see also* Hewett Tr. at 246. TPT's Human Resources department instructed Hewett to count these days as 1.5 days of sick leave. 2d Am. Compl., Ex. 4, at 34. Although Hewett offered

---

[1] The content of that discussion is disputed—TPT asserts that Lebrija additionally discussed Hewett's lack of professionalism at work, including heavy Facebook usage and printing large personal documents at work. That dispute is discussed further below.

4

at various points to have her absences booked as FMLA leave, pursuant to TPT policy, two employees in the HR department informed Hewett that she was first required to exhaust her paid sick leave. Hewett Tr., Ex. I; Lehn Aff. ¶ 12 and Ex. A (TPT Sick Leave Policy); Lamp Aff. ¶ 4. Hewett also asserts that she was not provided with an FMLA Eligibility notice at any point. Hewett Aff. at 6 (First Amended Local Rule 56(a)(2) response, doc. 377).

In total, as a result of her condition, Hewett states that she had "absences" for a visit to a health care provider on the following dates: in 2012, on January 26, February 17, March 8, June 6, 19 and 25, July 2, 12, 16, 17, August 21 and 27, September 6, 11, 14, and 24; and in 2013, on May 1 and 6, August 8, September 16, 18, 23, and 25, and October 2. Pl.'s Opp'n Mem., App'x. A (doc. 378, p. 106). TPT asserts that Hewett used only six of her eight available sick days in 2012, and only six of her eight available sick days in 2013. Lehn. Aff., Ex. B (doc. 357-10, pp. 9–11).

Hewett has not produced any evidence that she requested medical leave for a period of three or more days, which would trigger her FMLA rights under TPT's policy, or any evidence that she requested medical leave for a period longer than her existing paid sick and vacation days. She has also failed to produce any evidence that any of her requests were denied.

B.  Hewett's Performance at TPT

Hewett was a salaried employee at TPT. Lehn Aff. at ¶ 6. Her starting salary was $130,000 per annum. *Id.* In 2012, she was paid a salary of $132,000 per annum. *Id.* In 2013, she received a salary of $136,000 per annum. *Id.* Hewett also received a bonus of $2,500 in 2012, and $5,000 in 2013. *Id.* at ¶ 7.

Hewett's supervisor, Carlos Lebrija, stated that he had received numerous complaints from other TPT employees regarding Hewett's performance. Lebrija Aff. at ¶ 11. The parties

5

dispute whether Lebrija had previously spoken with Hewett about her poor performance, but emails attached to his affidavit indicate that employees complained about Hewett's performance on July 13, 2013 (email from Eva Beshlian to Lebrija, stating that Hewett "doesn't get anything"); and July 25, 2013 (email from Beshlian to Lebrija, stating that Hewett was "exhausting"; email chain including Lebrija indicating that Hewett did not understand her assignment).

On August 2, 2013, in response to his supervisor's request for employee assessments, Lebrija ranked Hewett as having a "Low" performance ranking and a low "Criticality" ranking, indicating that she was "well-integrated in the organization, although replaceable with limited disruption." Lebrija Aff., Ex. B.

On August 14, 2013, Brian Seidman forwarded to Lebrija an email discussion with Hewett indicating that "[s]he has not been able to replicate the first test case properly." On August 16, 2013, Seidman and Hewett had an email exchange, copying Lebrija, in which Seidman suggested that Hewett lacked the proper understanding to complete her work.

Lebrija stated in his deposition that he also had a conversation with Hewett on August 13, 2013 regarding complaints about her unprofessional conduct in the office, which included excessive personal printing and use of Facebook. Lebrija Tr. at 86; Walsh Aff., Ex. D (email from Hewett to Lehn, Ravo, and Lamp, Oct. 16, 2013, admitting use of Facebook and printer). At that time, Lebrija also expressed concern that her inconsistent working hours were playing into the perception that she was unprofessional. *Id.* at 87.

On September 4, 2013, Francis Mizell, another of Hewett's colleagues, emailed Lebrija expressing concern about Hewett and stating that she did not seem to be "understanding what is needed" and was creating extra work for others through her errors. Lebrija Aff., Ex. C. Lebrija

then spoke with his supervisor, Mike Ravo, about the situation and made the decision to terminate Hewett. Lebrija Aff. at ¶ 22. Lebrija also informed Lehn of the decision, and planned to inform Hewett the following Friday (September 6). *Id.* Ex. C.

On September 20, 2013, TPT terminated Hewett's employment for poor performance. Lebrija Aff. at ¶ 24; Lehn Aff. at ¶ 23.

### III. TPT's Motion for Summary Judgment

Construing the record in the light most favorable to Hewett and drawing all inferences in hers favor, Hewett has not pointed to a genuine issue of material fact regarding either of her claims.

The FMLA provides that "eligible employees" working for employers that are subject to the FMLA may take up to twelve weeks of uncompensated leave in a twelve-month period for, *inter alia*, "treatment of a serious health condition that makes the employee unable to perform the position of such employee." 29 U.S.C. § 2612(a)(1)(D). An employee becomes eligible for leave after working for the employer for at least twelve months and 1,250 hours. *Id.* § 2611(2)(A).

Under certain circumstances, an employee suffering from an ongoing "serious health condition" may request intermittent or reduced-schedule leave, but the employee must request that accommodation explicitly, and both the employee and employer must agree to such an arrangement. *Id.* § 2612(b). Employees who anticipate that they may need leave must notify their employers at least thirty days in advance of taking leave, or as early as is practicable. *Id.* § 2612(e)(2). An employer may require an employee to exhaust her paid leave prior to requesting FMLA leave, and an employer may also decide whether such leave should run consecutively or

concurrently. *Id.* § 2612(d)(1)–(2) ("An eligible employer may elect, or . . . require the employee, to substitute any of the accrued paid vacation leave, personal leave, family leave, or medical or sick leave of the employee for leave provided [in this statute]"); 29 C.F.R. §§ 825.207.[2]

Employees have a private right of action to enforce their right to FMLA leave. 29 U.S.C. § 2615; *Sarno v. Douglas Elliman-Gibbons & Ives, Inc.*, 183 F.3d 155, 160 (2d Cir. 1999). The Second Circuit distinguishes between claims that allege FMLA "interference" under 29 U.S.C. § 2615(a)(1) and "retaliation" claims under § 2615(a)(2)–(b). *Sista v. CDC Ixis N.A., Inc.*, 445 F.3d 161, 175–76 (2d Cir. 2006); *Potenza v. City of N.Y.*, 365 F.3d 165, 167 (2d Cir. 2004); *see also Voltaire v. Home Servs. Sys., Inc.*, 823 F. Supp. 2d 77, 90 (E.D.N.Y. 2011). Hewett frames her claims as primarily claims of FMLA interference, although she additionally asserts that she was terminated in retaliation for anticipated leave to be taken sometime in the future. Am. Compl. at p. 6.

I examine each potential cause of action, below, beginning with FMLA interference.[3]

---

[2] Hewett frequently cites 29 C.F.R. § 825.207(a) as evidence that she was denied FMLA benefits. The regulation provides in relevant part:

> Generally, FMLA leave is unpaid leave. However, under the circumstances described in this section, FMLA permits an eligible employee to choose to substitute accrued paid leave for FMLA leave. If an employee does not choose to substitute accrued paid leave, the employer may require the employee to substitute accrued paid leave for unpaid FMLA leave. The term substitute means that the paid leave provided by the employer, and accrued pursuant to established policies of the employer, will run concurrently with the unpaid FMLA leave. Accordingly, the employee receives pay pursuant to the employer's applicable paid leave policy during the period of otherwise unpaid FMLA leave. An employee's ability to substitute accrued paid leave is determined by the terms and conditions of the employer's normal leave policy.

Hewett seems to interpret that language to mean that employers *must* substitute paid leave for unpaid leave, such that they run concurrently. But TPT does not appear to have exercised its right to *choose* to substitute its paid leave for FMLA leave. Instead, it *added* paid leave time on top of the unpaid FMLA leave requirements. Thus, 29 C.F.R. § 825.207 does not apply.

[3] I note that Hewett makes reference to the ADA and the Connecticut Family and Medical Leave Act at various points in the complaint. She does not assert a cause of action under either statute, however, and even if she had, those claims would fail for the same reason as the FMLA claims.

A. <u>FMLA Interference</u>

To make a prima facie showing of FMLA interference, Hewett must show that: (1) she is an FMLA-eligible employee; (2) the defendant is an employer, as defined in the FMLA; (3) she was entitled to take FMLA leave; (4) she gave notice to her employer of her intention to take leave; and (5) she was denied FMLA benefits to which she was entitled. 29 U.S.C. § 2612(a)(1); *Achille v. Chestnut Ridge Transp., Inc.*, 584 F. App'x 20 (2d Cir. 2014). Although it has not been formally incorporated into the required elements for an FMLA interference claim, the Second Circuit has suggested that a terminated plaintiff must also show that the employer "considered [the exercise of FMLA rights] a negative factor in its decision to terminate [her]." *Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 176 (2d Cir. 2006) (observing that such evidence would be required for either a retaliation or interference claim to survive).

The parties appear to agree that Hewett was an FMLA-eligible employee and that TPT is an FMLA-bound employer. The parties also seem to agree that Hewett was entitled to FMLA leave in the months leading up to her termination.[4] Thus, in order to survive summary judgment, Hewett must produce sufficient evidence to permit a reasonable jury to find in her favor on the last two elements, and arguably, also find that her FMLA requests were a "negative factor" in her termination.

*1. Notice to Employer of Intention to Take Leave*

In Appendix 1 of her second amended response to TPT's Rule 56(a)(1) statement, Hewett now provides several emails in support of her argument that she did provide notice to TPT of her intention to take FMLA leave. (doc. 383)

---

[4] In fact, Hewett actually took two days of sick leave (which she incorrectly characterizes as FMLA leave) in January 2013 in order to care for her mother. Hewett Tr. at 347–48; email from Lebrija to Hewett, Jan. 22, 2013, doc. 357-5, p. 118 ("You can use sick time for those [days off].").

Hewett's emails generally put TPT on notice of her medical conditions and her course of care. When she invokes the FMLA specifically, however, it is in the conditional—she offers to use FMLA coding if TPT would prefer it, an offer that TPT consistently declined. *See* (doc. 378, pp. 102, 109–10) (email from Hewett to Lebrija and Lamp on June 23, 2012; from Hewett to Lebrija and Lehn on August 16, 2013; from Hewett to Lamp on August 23, 2013). Given TPT's policy, which allowed Hewett to use her paid leave *before* taking unpaid leave under the FMLA, Hewett did not need to use FMLA leave—she still had two sick days remaining at the time she was terminated, and had not made any requests for more than two days of FMLA leave. Lehn Aff., Ex. B.

Two of Hewett's emails merit closer consideration: first, as discussed at the motion to dismiss stage, Hewett's August request for an accommodation for her asthma medication invokes the possibility of a future need for a schedule adjustment under the ADA. (doc. 378, p. 109) (email from Hewett to Lebrija and Lehn on August 16, 2013). But Hewett later assured Human Resources that the accommodation of her nebulizer at work was sufficient for her needs, thereby undermining the idea that her employer believed she would take or request FMLA leave for her condition. Hewett Tr., Ex. N (email from Hewett to Lehn stating "Let's consider the issue resolved unless anyone complains about it."). Because the issue was resolved without Hewett needing to take leave, it makes no sense for TPT to then re-notify Hewett of the availability of FMLA leave.

Hewett's email to Lebrija on June 24, 2012 comes closer to triggering the notice requirement because she states that her recurrent lung infections may regularly require time at home or hospitalization. (doc. 378, p. 103) That email accordingly put TPT on notice that Hewett might need to take leave from work on a regular basis as a result of a single medical condition,

10

which circumstances satisfy the FMLA's "intermittent leave" requirements. In the light most favorable to Hewett, that reference to a need for regular leave combined with Hewett's diminishing sick days are arguably sufficient to put TPT on notice that she would likely exceed her allotted time and require FMLA leave.[5]

### 2. Denial of FMLA Benefits to Which She Was Entitled

Even if Hewett has met the notice requirement, however, she has nevertheless failed to demonstrate that she was actually denied any FMLA benefits during her employment, or that she was "somehow hindered from exercising her rights by [TPT's] failure to provide notice of the protections afforded under the Act." *Fritz v. Eye Ctr.*, 2010 WL 3210863, at *3 (D. Conn. Aug. 12, 2010), *motion for relief from judgment granted on other grounds,* 2010 WL 4830000 (D. Conn. Nov. 17, 2010).

First, Hewett seems to admit that TPT did not actually deny her any medical leave that she requested, and in fact, provided her with satisfactory accommodations as well as a more generous leave policy than the statute itself requires.[6] Instead, Hewett complains that she was denied her right to receive notice of her FMLA rights from TPT. In support of that proposition, she cites *Young v. Wackenhut Corp.*, 2013 WL 435971 (D.N.J. Feb. 1, 2013). But that court in fact correctly stated that "[t]o establish an interference claim based on failure to give notice [of FMLA rights], a plaintiff must show 'impairment of [her] rights and resulting prejudice.'" *Id.* at

---

[5] Separately, Hewett asserts that Lebrija knew she was being evaluated for a more serious illness at the time that she was terminated. That allegation does not appear to be supported by any evidence, and instead seems to arise from Hewett's own knowledge at that time that she was being evaluated by her doctors for additional treatments. And in direct contradiction to that assertion, Hewett also stated that her "need for blood plasma transfusions was unforeseeable" at the time of her termination, which argument directly conflicts with *both* her allegation that TPT was on notice about her need for leave on that basis as well as any suggestion that she was terminated *because* of that treatment. *See* Pl.'s Opp'n Br. at 6, 114.

[6] That point is discussed above, in footnote two. To reiterate, an employer that wishes to offer paid leave may either substitute that leave for FMLA leave, meaning that the paid leave and the FMLA-mandated leave run concurrently, or may add additional paid time, meaning that the paid leave and the FMLA-mandated leave run sequentially. Neither option is a violation of the statute. *See Vlahos v. Schroeffel*, 2006 WL 544444, at *3 (E.D.N.Y. Mar. 6, 2006).

*3 (quoting *Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81, 90 (2002)); *see also Roberts v. Health Ass'n*, 308 F. App'x 568, 569 (2d Cir. 2009) (same). And, as TPT points out, Hewett has failed to present evidence that she would have materially changed her conduct in any way if her leave had been classified under FMLA. Def.'s Br. at 28. Indeed, Hewett admitted in her deposition that the only change she might have made would involve compliance with the FMLA paperwork requirements. *See* Hewett Tr. at 347.

Hewett may alternatively be understood to argue that TPT, through Lebrija in the August 13th meeting, interfered with her exercise of FMLA rights by criticizing her hours and thereby discouraging her from taking more time off. Other courts, however, have easily rejected the argument that asking an employee to "spend more time at work" or to make up lost time from an FMLA-related absence, without more, is sufficient evidence of interference. *See Di Giovanna v. Beth Israel Med. Ctr.*, 651 F. Supp. 2d 193, 201 (S.D.N.Y. 2009); *Weichman v. Chubb & Son*, 552 F. Supp. 2d 271, 290 (D. Conn. 2008).

Finally, Hewett argues essentially that her termination is itself a denial of her future use of FMLA benefits. The Second Circuit has squarely rejected that argument:

> That [the plaintiff's] termination necessarily prevented him from taking *future* FMLA leave—which he had not yet requested, and had no plans to request—does not create an issue of fact as to whether [the defendant] attempted 'to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under' the FMLA. *See* 29 U.S.C. § 2615(a)(1).

*Thomsen v. Stantec, Inc.*, 483 F. App'x 620, 622–23 (2d Cir. 2012), *cert. denied,* 133 S. Ct. 931 (2013). Similarly here, Hewett had not yet requested time off, nor did she have any concrete plans to do so.

Instead, the fact that Hewett was terminated for legitimate business reasons—discussed further below—negates her interference claim. As I mentioned above, the Second Circuit has

suggested that FMLA-protected activities must have been a "negative factor" in the decision to terminate in order for an FMLA interference claim to survive. *See Sista*, 445 F.3d at 176. A district court decision from the Southern District of New York collected support for that principle as follows:

> [I]t is well-settled that an employer is not liable for 'interfering' with an employee's leave when the employee would have been terminated regardless of the leave. *See* [*Sista*] at 175–177; *see also* 29 C.F.R. [§] 825.216(a) ('An employee has no greater right to reinstatement ... than if the employee had been continuously employed during the FMLA leave period.'); *Throneberry v. McGehee Desha County Hosp.,* 403 F.3d 972, 979 (8th Cir. 2005) ('As long as an employer can show a lawful reason, i.e., a reason unrelated to an employee''s exercise of FMLA rights, for not restoring an employee on FMLA leave to her position, the employer will be justified to interfere with an employee's FMLA leave rights.'); *Geromanos v. Columbia Univ.,* 322 F. Supp. 2d 420, 429 (S.D.N.Y. 2004) ('FMLA is not a shield to protect employees from legitimate disciplinary action by their employers if their performance is lacking in some manner unrelated to their FMLA leave.').

*Pearson v. Unification Theological Seminary*, 785 F. Supp. 2d 141, 162 (S.D.N.Y. 2011). Similarly here, Hewett cannot use her potential need for FMLA leave as a "shield" against a legitimate termination.[7]

Accordingly, summary judgment is entered for TPT on the interference claim.

B. FMLA Retaliation

The Second Circuit treats instances in which an employer allegedly disrupts an employee's FMLA rights through termination as a form of retaliation and applies the retaliation analysis from *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See also Potenza*, 365 F.3d at 168. To establish a prima facie claim of retaliation under the FMLA, Hewett must

---

[7] Hewett's repeated invocation of *Caldwell v. Holland of Texas, Inc.*, 208 F.3d 671 (8th Cir. 2000), for the proposition that "[a]n employer does not avoid liability by discharging an employee who takes leave in order to seek treatment for a condition that is later held to be covered by the FMLA" is inapposite. *Id.* at 677. In *Caldwell*, the employee was terminated for taking leave to care for her son, and the question was whether her son's condition triggered FMLA leave. Here, however, Hewett has not shown that she was terminated for taking or requesting leave, and instead, TPT has provided ample evidence that she was terminated for legitimate business reasons. Accordingly, the fact that Hewett may have subsequently developed a qualifying condition is irrelevant. It is clearly not the case that any person who is terminated for any reason and later develops an illness may recover under the FMLA.

establish that: (1) she exercised rights protected under the FMLA; (2) she was qualified for her position; (3) she suffered an adverse employment action; and (4) the adverse action occurred under circumstances giving rise to an inference of retaliatory intent. *Potenza*, 365 F.3d at 168; *Stevens v. Coach USA*, 386 F. Supp. 2d 55, 61 (D. Conn. 2005).

Under *McDonnell Douglas*, once the plaintiff has made a prima facie case for retaliation, the burden shifts to the defendant to state a legitimate, non-discriminatory reason for its action. 411 U.S. at 802–03; *Potenza*, 365 F.3d at 168; *Stevens*, 386 F. Supp. 2d at 61. Construing her pleadings liberally as a pro se litigant, Hewett has not produced sufficient evidence to permit a reasonable jury to find a prima facie case of FMLA retaliation.

At the motion to dismiss hearing, I determined that Hewett had made out a prima facie case for retaliation based on the close temporal relationship between Hewett's increasing requests for medical leave in August and September, which arguably suggested that she would soon exceed her allotted sick days and require FMLA leave, and her termination. The evidence produced for summary judgment, however, considerably weakens Hewett's prima facie case.

First, as with the interference claim above, it is unclear that Hewett actually exercised any of her FMLA rights, given that she never requested nor was denied medical leave or accommodations. If she never exercised FMLA rights, she could not have been retaliated against for doing so.

More importantly, however, she has failed to uncover any evidence of retaliatory animus beyond the temporal proximity of her termination. In fact, she actually concedes that the negative performance review she received on August 2, 2013 was *not* motivated by FMLA retaliatory animus, significantly narrowing the window in which such animus could have developed and adding credence to TPT's claim that the termination was legitimately justified. *See* Pl.'s 56(a)(2)

14

Stmt. at 49 (doc. 383). Although Hewett has described the timing of the performance reviews as inexplicable and the content as baseless lies, she has not shown any evidence that the complaints or the performance evaluations changed as a result of her FMLA needs. *Compare Sotomayor v. City of New York*, 862 F. Supp. 2d 226, 263 (E.D.N.Y. 2012), *aff'd,* 713 F.3d 163 (2d Cir. 2013) (finding no prima facie case of FMLA retaliation where the plaintiff began receiving negative evaluations and letters in her file prior to her application for her first FMLA leave), *with Donnelly v. Greenburgh Cent. Sch. Dist. No. 7*, 691 F.3d 134, 152 (2d Cir. 2012) (concluding an inference of retaliatory animus existed where plaintiff showed "more evidence than mere temporal proximity," including sudden negative evaluations that "expressly penalize [the plaintiff] for his excessive absences").

Hewett correctly points out that "[v]erbal comments constitute evidence of discriminatory motivation when a plaintiff demonstrates that a nexus exists between the allegedly discriminatory statements and a defendant's decision to discharge the plaintiff." *Schreiber v. Worldco, LLC*, 324 F. Supp. 2d 512, 518 (S.D.N.Y. 2004). But she has not pointed to any such remarks in the present case. As with her interference claim, Hewett may be understood to argue that Lebrija's comments about her hours in the August 13th meeting indicate a retaliatory intent. In that meeting, Hewett states that Lebrija complained about the frequent absences and inconsistent hours caused by her need for medical care and treatments. But Hewett subsequently sought and received accommodation for her hours and stated that the situation had been resolved. She has failed to produce any evidence that Lebrija continued to harbor retaliatory animus regarding those absences such that he would seek to fabricate or overstate the evidence regarding her poor performance.

C.  <u>Legitimate Business Reason for Termination</u>

Regardless of whether Hewett wins all of the above points, however, the legitimate

reason for her termination still dooms both of her claims.

TPT asserts that Hewett was terminated for poor performance. It has provided significant

evidence of Hewett's inability to perform her job at the required level, her unprofessional

conduct, as well as numerous complaints about Hewett from her co-workers going back to April

2013. *See* Lebrija Aff. Ex. A–D.[8] And TPT has offered evidence that Lebrija's decision to

terminate Hewett was a direct response to those complaints. *Id.* Hewett also now vociferously

denies that Lebrija actually met with her to discuss her excessive printing and Facebook use, and

further denies that she engaged in either of those activities; however, shortly after her

termination, she appears to have admitted to doing both in an attempt to justify her behavior. *See*

Walsh Aff., Ex. D (doc. 357-8).

And Hewett has failed to produce evidence from which a reasonable jury could find that

those legitimate business reasons are pretextual. First, even assuming Hewett has made out a

prima facie case of retaliation based on the timing of her termination, evidence of "temporal

proximity between protected activity and an adverse employment action, alone, is insufficient to

establish pretext." *Davies v. New York City Dep't of Educ.*, 563 F. App'x 818, 820–21 (2d Cir.

2014) (citing *El Sayed v. Hilton Hotels Corp.*, 627 F.3d 931, 933 (2d Cir. 2010); *Ben–Levy v.

Bloomberg, L.P.*, 518 F. App'x. 17, 19 (2d Cir. 2013)). Instead, at this stage of the analysis,

Hewett must produce "not simply some evidence, but sufficient evidence to support a rational

finding that the legitimate, non-discriminatory reasons proffered by [the defendant] were false,

and that more likely than not discrimination was the real reason for the employment action."

---

[8] Hewett suggests that those emails cannot be considered in this motion because they are "hearsay," or otherwise inadmissible. But the emails, whether true or not, are admissible in order to show the effect that they had on Lebrija when he received them, and to explain why he acted as he did to terminate Hewett.

*Serby v. New York City Dep't of Educ.*, 526 F. App'x 132, 135 (2d Cir. 2013) (internal quotation marks and citation omitted).

Construed liberally, Hewett argues that the decision was pretextual because: (1) she did not actually perform poorly; (2) she was not notified of the emails; and (3) Lebrija failed to coach or improve her performance.[9] All of those arguments fail.

With respect to whether Hewett had poor performance, she has failed to present any material evidence that the complaints were fabricated, exaggerated, or retaliatory. She suggests—albeit inconsistently with her later statement that the report was *not* due to FMLA retaliatory animus—that the written performance appraisal on August 2 was pretextual because she had never had such a review before; however, it is clear from the attached emails that Lebrija was asked to engage in that assessment for *all* employees on his team at that time. *See* Lebrija Aff., Ex. B (doc. 357-12, p. 90). Hewett's other arguments that she actually had performed acceptably do not matter here; instead, Hewett would need to produce evidence that Lebrija did not actually hold a belief that she had performed poorly, which she has failed to do. *See Ben-Levy*, 518 F. App'x at 19 (holding that the key question is whether the employer honestly held a belief of bad performance, regardless whether that belief was in fact erroneous, and collecting cases holding same); *see also McPherson v. New York City Dep't of Educ.*, 457 F.3d 211, 216 (2d Cir. 2006) (rejecting an argument based on the "*reliability* of the evidence" supporting an adverse termination action because a Title VII inquiry is "interested in what '*motivated* the employer;' the factual validity of the underlying imputation against the employee is not at issue") (citing *U.S. Postal Service Bd. of Governors v. Aikens*, 460 U.S. 711, 716 (1983)).

---

[9] I note that Lebrija stated in his deposition that he did make several efforts to speak with Hewett about her performance, and an email exchange with Brian Seidman refers Hewett to Lebrija for assistance in understanding the work. *See* Lebrija Aff., Ex. B (doc. 357-12, pp 9-11). Nevertheless, drawing all inferences in favor of Hewett, a reasonable jury could arguably find that Lebrija never made any reference to Hewett's poor performance before her termination.

The second and third arguments do not raise legal issues on their face, because there is no requirement that an employee have notice of the complaints against her nor that she receive additional coaching before she may be terminated for poor performance.[10] Further, there is no indication that TPT contracted with Hewett for such entitlements, either through her at-will employment contract or through subsequent official policies. Hewett suggests that TPT's failure to investigate her FMLA complaint was a violation of company policy, *see* Pl.'s Opp'n Br. at 39–41, but her FMLA complaint was made after she was terminated, and the policy on which she relies strongly suggests that it only refers to current employees, *see id.* at 41 (policy is taken from the "employee handbook," instructs the complainant to report to her "supervisor or Human resources"). At best, Hewett might be understood to make a kind of disparate treatment argument. But she has failed to produce any evidence indicating that other employees who required extensive coaching were entitled to keep their positions or were otherwise treated more favorably than she was.

Hewett has thus failed to meet her burden at this stage, so summary judgment is granted on the retaliation claim in favor of TPT.

## VI. Conclusion

TPT's motion for summary judgment is **granted** in full. The Clerk shall enter judgment and close this file.

So ordered.

---

[10] Hewett suggests that a "performance improvement plan" is required, citing *Phillips v. StellarOne Bank*, 2012 WL 3762448 (W.D. Va. July 16, 2012). But in *Phillips*, the court found not that a performance plan was required, but instead that a performance plan could not include deliberate obstacles for the employee in order to provide a justification for termination. *See id.* at *5. The case does not, however, provide support for Hewett's claim that she was entitled to such a plan. In fact, there are many cases in the Second Circuit in which an employee-plaintiff attempts to assert (albeit unsuccessfully) that being placed on a performance improvement plan is an adverse employment action. *See, e.g.*, *Brown v. Am. Golf Corp.*, 99 F. App'x 341, 343 (2d Cir. 2004).

Dated at Bridgeport, Connecticut, this 2nd day of June 2016.

<u>/s/ STEFAN R. UNDERHILL</u>
Stefan R. Underhill
United States District Judge